STATE OF NORTH CAROLINA v. CLINTON RONDALE KIRKLEY

No. 155A81

(Filed 3 May 1983)

1. **Criminal Law § 135.3; Jury § 7.11— exclusion of jurors for capital punishment views**

The trial court in a first degree murder prosecution properly excused for cause six prospective jurors who gave absolute, unequivocal statements that they would be unable to follow the law and would not vote to recommend a sentence of death even if the State had convinced them beyond a reasonable doubt that the aggravating circumstances required the death penalty. Furthermore, the trial court did not err in excusing for cause another prospective juror who stated, in response to questions by the court as to whether she could vote for the death penalty under appropriate circumstances, that she didn't "feel" like she would or didn't "think" she could since her answers reflected her inability to put aside her personal views and follow the law when considered in the context of her entire examination.

2. **Criminal Law § 135.3; Jury § 7.11— exclusion of jurors for capital punishment views—fair cross-section of community**

Defendant was not deprived of a jury composed of a fair cross-section of the community by the exclusion of seven jurors who indicated that they could not impose the death penalty under any circumstances.

3. **Criminal Law § 63— mental condition one week after crimes—exclusion not prejudicial error**

While a psychologist's opinion testimony as to defendant's mental status one week after the shootings in question was admissible for consideration on the issue of defendant's mental condition at the time of the shootings, the exclusion of such testimony cannot be held prejudicial error where defendant failed to take exception to the court's ruling at trial and failed to have the excluded testimony placed in the record. G.S. 15A-1446(a).

4. **Criminal Law § 102.7— jury argument—credibility of expert witness—no gross impropriety**

In a prosecution for first degree murder, disparaging remarks about defendant's expert psychiatrist made by the prosecutor in his jury argument were not so grossly improper as to require the trial court to intervene *ex mero motu* in light of the psychiatrist's testimony reflecting both a lack of preparation and an absence of thorough investigation into defendant's mental and physical condition at the time of the crimes.

5. **Criminal Law § 102.6— jury argument—intoxication necessary to negate premeditation and deliberation—no gross impropriety**

Statements made by the prosecutor concerning the level of intoxication necessary to negate premeditation and deliberation were not so grossly improper as to require the trial judge to intervene *ex mero motu.*

**6. Criminal Law § 102.6— how murders were committed—jury argument—supporting evidence**

In a prosecution for two murders, there was sufficient evidence in the record from which the prosecutor's scenarios in his jury argument as to how each murder was committed could reasonably be inferred.

**7. Criminal Law § 6; Homicide § 8.1— first degree murder—intoxication defense—effect of mental disorder**

The trial court in a first degree murder case did not err in failing to instruct the jury to consider evidence of defendant's mental condition as well as evidence of his intoxication in determining his ability to premeditate and deliberate and form a specific intent, since the insanity and intoxication defenses are treated separately, and a mental disorder which is insufficient to establish legal insanity may not be used to negate premeditation and deliberation and specific intent.

**8. Criminal Law § 135.4— first degree murder—sentencing hearing—prosecutor's remarks about mitigating factors—absence of prejudice**

Defendant was not prejudiced by the prosecutor's remarks concerning the weight several mitigating factors should be afforded and suggesting that one mitigating factor was really aggravating where any possible confusion created in the minds of the jurors by the prosecutor's argument was eliminated by the trial court's instruction making it clear that there was only one aggravating factor to be considered by the jury.

**9. Criminal Law §§ 102.12, 135.4— death sentence as deterrent—jury argument—impropriety not gross**

The prosecutor's argument that the jury should impose the death sentence as a deterrent was not grossly improper so as to warrant intervention by the trial court *ex mero motu.*

**10. Criminal Law § 135.4— first degree murder—sentencing hearing—order of issues**

The trial court did not err in submitting an issue as to whether the jury found that the aggravating circumstance found by it was sufficiently substantial to call for imposition of the death penalty as issue number two which was to be decided prior to the consideration of any mitigating circumstances, and in instructing the jury that if it answered the second issue "no" it would have to recommend a sentence of life imprisonment, since the procedure employed by the court simply allowed the jury the opportunity to impose a life sentence without first considering the mitigating circumstances and neither allowed the jury to contemplate imposing the death penalty prior to its consideration of all the mitigating circumstances nor diminished the impact the mitigating circumstances had on the jury.

**11. Criminal Law § 135.4— first degree murder—sentencing hearing—form of fourth issue**

The form of the fourth issue submitted to the jury as to whether the jury found beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances was not erroneous.

State v. Kirkley

### 12. Criminal Law § 135.4— first degree murder—sentencing hearing—aggravating and mitigating circumstances—unanimity of verdict

The jury must unanimously find that an aggravating circumstance exists before that circumstance may be considered by the jury in determining its sentence recommendation. Likewise, the jury must unanimously find that a mitigating circumstance exists before it may be considered for the purpose of sentencing, and the trial court did not err in instructing the jury that a mitigating circumstance must be deemed not to exist in the absence of unanimous agreement on its existence. G.S. 15A-2000; Art. I, §§ 24 and 25 of the N.C. Constitution.

### 13. Criminal Law § 135.4— first degree murder—sentencing hearing—no history of prior criminal conduct—peremptory instruction required

In a sentencing hearing in a first degree murder case in which the trial court determined that the evidence showed no significant history of prior criminal conduct and instructed the jury to that effect, the trial court should have instructed the jury to answer "yes" to the finding of no significant criminal history, and the court committed prejudicial error in instructing the jury that it could find such factor not to be mitigating and therefore that it did not exist, since the legislature has determined that in all capital cases the absence of a significant history of prior criminal activity is a mitigating circumstance. G.S. 15A-2000(f)(1).

### 14. Criminal Law § 135.4— first degree murder—sentencing hearing—motion to impose life sentence after jury had deliberated for some time

The trial court did not abuse its discretion in refusing to impose a life sentence in each of two capital cases on the ground that the jury had not reached a unanimous sentence recommendation within a reasonable time where the jury's deliberations were interrupted twice for meals and twice for further instructions; the total time the jury actually spent deliberating was approximately seven hours; the longest uninterrupted span of time for deliberations was one hour and fifty-two minutes; and the jury was confronted with fourteen mitigating factors which had to be considered in two separate cases. G.S. 15A-2000(b).

### 15. Criminal Law § 135.4; Homicide § 31.3— first degree murder—premeditation and deliberation—submission of second degree murder—death penalty not unconstitutional

Although the practice overruled in *State v. Strickland*, 307 N.C. 274 (1983), of requiring the trial court to instruct on second degree murder in all first degree murder cases in which the State relied on premeditation and deliberation, regardless of whether there was evidence to support the lesser offense, was in use at the time of defendant's trial for first degree murder, the death penalty was not unconstitutional in defendant's case because of such practice where defendant's evidence supported the trial court's submission of an issue of the lesser offense of second degree murder.

**16. Criminal Law § 135.4; Homicide § 31.3— first degree murder—guilt and penalty phases—same jury—constitutionality**

The procedure set out in G.S. 15A-2000(a)(2) which requires the same jury to hear both the guilt and penalty phases of a first degree murder trial is not unconstitutional.

**17. Criminal Law § 135.4— first degree murder—sentencing hearing—submission of two killings as aggravating circumstance for each other**

It is not unconstitutional for the State to try, convict and sentence a defendant for a series of crimes and then submit those same crimes as aggravating factors during the sentencing hearing in a capital case.

**18. Criminal Law § 135.4— course of conduct aggravating circumstance—constitutionality**

The "course of conduct" aggravating circumstance set forth in G.S. 15A-2000(e)(11) is not unconstitutionally vague.

**19. Criminal Law § 135.4— mitigating circumstances—burden of proof**

The trial court properly placed upon the defendant the burden of proving, by the preponderance of the evidence, the existence of each mitigating factor.

Justice EXUM concurring in part and dissenting in part.

ON appeal by defendant as a matter of right from the judgments of *Snepp, Judge,* entered at the 8 September 1981 Schedule A Criminal Session of Superior Court, MECKLENBURG County. Defendant was charged in indictments, proper in form, with the first degree murders of William Leroy Brown and Willie James Potts and with assault with a dangerous weapon with the intent to kill causing serious injury on Jerry T. Kelly and Gregory Curtis Anthony. The jury returned verdicts of guilty on each charge and recommended the sentence of death in both murder cases. *Judge Snepp* imposed consecutive twenty year sentences for each assault conviction and ordered the imposition of the death penalty for each murder conviction. On 26 August 1982 we granted the defendant's motion to by-pass the Court of Appeals on the two assault convictions.

In relevant part, the State's evidence tended to show the following: In the early morning hours of 18 May 1981, Ms. Jane Green, a resident of 3900 Rozzells Ferry Road in Charlotte, heard two gunshots outside her home and as she peered out of a window, she observed a small car leaving the area in front of her home. At that time she saw a person lying in the ditch on the side of the road. She called the police. While awaiting the arrival of

the police Ms. Green saw a car, similar to the one she had seen in the area in front of her house, drive down Crigler Street and come to a stop. The driver got out of the car, walked around and then returned to the vehicle and drove off.

The police arrived at the scene in response to Ms. Green's call and discovered William Leroy Brown lying in a ditch along Rozzells Ferry Road. Mr. Brown had sustained a gunshot wound to the chest and two gunshot wounds to the head with a wound to the right forehead being fatal.

At approximately the same time that Ms. Green saw an automobile travel down Crigler Street, Mr. Gilbert Hargrove, a resident of 330 South Crigler Street, heard two gunshots. Upon investigation Mr. Hargrove observed a car drive away from the dead end portion of the street. After the car drove away, Mr. Hargrove saw a person stagger and fall three times. He immediately called the police.

The police arrived on the scene shortly after Mr. Hargrove's call and discovered Willie James Potts lying along the side of Crigler Street. At that time Mr. Potts was alive but he was unable to identify his assailant. Mr. Potts had been shot twice in the chest and he died as the result of a gunshot wound to the left chest. The bullet passed through his left lung.

The police investigation of each homicide scene resulted in the recovery of some bullets and bullet fragments. On Rozzells Ferry Road, at the scene of William Leroy Brown's murder, the police recovered bullet fragments on the very spot where Mr. Brown's body was discovered. In addition to the projectiles found at the scenes of these two murders, the medical examiner recovered several bullet fragments from the cranial cavity of William Leroy Brown.

Shortly before 4:00 a.m. on the morning of 18 May 1981 Jerry Kelly was sitting in his car smoking a cigarette in the parking lot of Arby's restaurant located on East Independence Boulevard. A small yellow car pulled up alongside of him. After a short conversation with the driver of the small yellow car, the driver, whom Mr. Kelly identified as the defendant, shot Kelly in the neck. As Mr. Kelly attempted to protect himself by lying down on the floor of his car, the defendant shot him in the elbow resulting in a per-

manent injury to the arm. After being shot the second time, Mr. Kelly heard the car drive away. The location of the assault on Mr. Kelly is approximately eight miles from the scenes of the two homicides on Rozzells Ferry Road and South Crigler Street.

Around 4:30 a.m., approximately thirty minutes after Mr. Kelly was shot in Arby's parking lot, Gregory Anthony was leaving work at Bojangle's restaurant on the corner of West Boulevard and South Tryon Street when a yellow car drove up and the driver offered to sell Mr. Anthony some marijuana. Anthony identified the defendant as the driver of the yellow car. Anthony and the defendant left the Bojangle's parking lot and went to Kingston Street where they smoked some marijuana. While Anthony was smoking the marijuana, the defendant shot him in the jaw causing paralysis in Anthony's tongue and vocal cords. In response to this assault Anthony pointed a replica of a gun at the defendant, who in turn ran away. Anthony summoned the police who immediately responded.

Officer Harlee of the Charlotte Police Department, while investigating the shooting of Mr. Anthony on Kingston Street, observed a small yellow car traveling slowly by his location. Upon stopping this vehicle, Officer Harlee found the defendant in the driver's seat holding a silver pistol which was later identified as a five shot .44 caliber revolver. A subsequent search of the defendant uncovered several spent .44 caliber shell casings.

Tests conducted by the Charlotte crime lab revealed that the defendant had recently fired a firearm. Further tests showed that the bullets recovered at the homicide scenes on Rozzells Ferry Road and South Crigler Street and the projectile removed from Jerry Kelly's elbow had been fired from the .44 caliber revolver found in the defendant's possession at the time of his arrest.

The defendant gave a statement to the police which reads as follows:

I am giving Investigator Rick Sanders permission to write this for me. Sometime after midnight, early Monday morning, I left a party at Jay's house off of Senaca. I had taken a Quaalude at the party. I was riding around and I rode over to Rozzells Ferry Road. I seen a black male walking down the

street, and I stopped and talked to him. I don't remember what I said. The next thing I know, I was shooting him. I then went down a dead-end close by, and seen another black male walking. I said something to him, and then shot him. A little while later, I went to Bojangle's Chicken on West Boulevard. There I started talking to another black male in a little sports car. He asked me if I wanted to smoke a joint. I also told him I had something to sell. I told him I was getting paranoid, and I wanted to go somewhere else. He followed me around the corner. I went to his car on the passenger side. I had my gun on the left side with the holster un-snapped just in case he tried something. As I got up to the car, he pulled a gun on me, and I pulled mine and shot him in the face. I then ran back to my car and left. A short time later, I came back to the road, and as I was turning onto the road, I seen Investigator Sanders. I drove on down and was stopped by a black uniformed officer. I was coming back to turn myself in.

A search of defendant's car resulted in the recovery of co-caine, marijuana, diazepam (valium) and another drug which is a non-controlled substance. Drug use paraphernalia and some empty beer containers were also found in defendant's car. In addition, the license tag on defendant's vehicle was bent upward in a man-ner which made it very difficult to read the number on the plate.

Dr. McBay, a toxicologist from the North Carolina Chief Medical Examiner's office, reported that blood samples taken from the defendant, approximately six hours after his arrest, revealed the presence of cocaine and diazepam (valium). A similar test conducted by Dr. Bryan Finkle from the Center for Human Toxicology in Salt Lake City, Utah, revealed the presence of co-caine, diazepam (valium), benzoylecgonine and nordiazepam in defendant's blood.

Throughout its presentation of evidence the State produced the testimony of witnesses who stated that the defendant's movements and speech patterns were normal. Several witnesses also testified that the defendant displayed no erratic or unusual driving pattern.

The defendant presented evidence tending to show that he acted in self-defense in shooting Mr. Anthony and that he lacked

the specific intent necessary to have committed first degree murder or assault with a deadly weapon with the intent to kill.

Numerous witnesses testified that the defendant was a heavy drug user and due to family problems had gone on a drug spree for the three days prior to the shootings. According to the defendant's fiancee, Kim Strother, the defendant consumed large quantities of cocaine and alcohol three days before the shootings. Further testimony of several defense witnesses indicated the defendant drank beer and took several drugs two days prior to the shootings.

Defendant testified that he "partied" on the night before the shootings, at which time he consumed large quantities of beer and cocaine. His testimony concerning the shootings was very similar to the statement he gave the police at the time of his arrest with the exception that he also vaguely remembered talking to a white male before hearing a shot. In short, defendant testified that he had a vague recollection of three shootings but was unaware of his thoughts at the time of each. However, he did remember in detail the circumstances surrounding the assault on Anthony which he contends was committed in self-defense.

Dr. Bryan Finkle testified that the amount of diazepam (valium) found in defendant's blood was greater than that normally prescribed for medicinal purposes. Dr. Finkle also testified that the presence of cocaine and diazepam in the blood at the same time could result in considerable turbulence within the brain.

Defendant also called Mr. O. B. Starnes, a psychologist who had administered several psychological tests to the defendant. Mr. Starnes testified for the purpose of establishing the professional manner in which the tests were administered. These tests were in part the basis of the testimony given by Dr. Selwyn Rose, a psychiatrist.

Dr. Rose testified that an examination of the defendant, interviews with his family, and the test results provided by Mr. Starnes revealed that the defendant was suffering from a mental disorder which by itself would not result in defendant's criminal behavior. However, Dr. Rose testified further that defendant's mental condition when coupled with drug intoxication would prevent defendant from premeditating and deliberating his actions.

At the end of all the evidence the jury found defendant guilty of two counts of first degree murder and two counts of assault with a dangerous weapon with the intent to kill causing serious injury. Judge Snepp imposed consecutive twenty year sentences for the assault convictions. The State relied on its evidence presented during the guilt determination of the trial and did not present any additional evidence at the sentencing hearing. The sole aggravating factor relied on by the State was that each murder was part of a course of conduct which included the commission of other violent crimes. On the other hand, the defendant offered the testimony of seven witnesses, including himself and offered in part the following in mitigation: his age; that he had no significant history of prior criminal behavior; that the crimes were committed while he was under the influence of mental or emotional disturbance; that he confessed to the crimes; that he surrendered to police without resistance and that he expressed remorse for his actions.

In its instructions during the sentencing hearing in each case, the court submitted one aggravating circumstance for the jury's consideration: The murder for which the defendant stands convicted was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons, G.S. 15A-2000(e)(11). The court also submitted fourteen mitigating circumstances for the jury to consider. The jury found that seven mitigating circumstances and one aggravating circumstance existed in each case. However, the jury unanimously found in each case that the mitigating factors were outweighed by the aggravating circumstance beyond a reasonable doubt. As a result the jury recommended the imposition of the death penalty for both murders, and the court so ordered.

Additional facts relevant to defendant's specific assignments of error will be incorporated into the opinion.

*Rufus L. Edmisten, Attorney General, by Assistant Attorney General Joan H. Byers for the State.*

*Adam Stein, Appellate Defender, by Assistant Appellate Defender Ann B. Petersen for the defendant-appellant.*

COPELAND, Justice.

Defendant brings forward numerous assignments of error which he contends require a new trial for these crimes, or a new sentencing hearing for the murder convictions, or both. We disagree as to the defendant's arguments for a new trial and affirm his convictions but we conclude that he is entitled to a new sentencing hearing.

## GUILT PHASE

### I.

[1] Defendant contends that he was deprived of his right to life without due process of the law and that he was deprived of right to trial by jury because seven potential jurors were struck for cause upon the State's challenge for cause, due to their scruples against capital punishment, in violation of *Witherspoon v. Illinois*, 391 U.S. 510, 20 L.Ed. 2d 776, 88 S.Ct. 1770 (1968). This issue has been raised many times before this Court. In *State v. Pinch*, 306 N.C. 1, 9, 292 S.E. 2d 203, 213 (1982), *cert. denied*, --- U.S. ---, 103 S.Ct. 474, 74 L.Ed. 2d 622 (1982), we stated:

The applicable constitutional standard permits the excuse of a potential juror for cause if it is established that he 'would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case. . . .' *Witherspoon v. Illinois*, 391 U.S. 510, 522 at n. 21, 88 S.Ct. 1770, 1777, 20 L.Ed. 2d 776, 785 (1968); see *State v. Cherry*, 298 N.C. 86, 257 S.E. 2d 551 (1979), *cert. denied*, 446 U.S. 941, 100 S.Ct. 2165, 64 L.Ed. 2d 796 (1980).

(Original emphasis.) Prior to the *Witherspoon* decision prospective jurors were excused for cause if they had a personal or religious conviction that the death penalty was wrong. Such a practice resulted in 79 of 150 veniremen being excused for cause in *State v. Spence*, 274 N.C. 536, 164 S.E. 2d 593 (1968). As recognized in *Witherspoon* the fact that someone opposes the death penalty, for whatever reason, does not mean they will not fulfill their duty to the state and refuse to impose the death penalty.

In the case *sub judice* sixty-three veniremen were examined over a period of four days resulting in seven hundred and forty-

nine pages of transcript. Seven of these sixty-three veniremen were successfully challenged for cause by the State. Of these seven potential jurors struck for cause, six veniremen gave absolute, unequivocal statements that they would be unable to follow the law and would not vote to recommend a sentence of death even if the State had convinced them beyond a reasonable doubt that the aggravating circumstances required the death penalty. For each of these six prospective jurors it was not his feelings against the death penalty which resulted in his being challenged for cause, instead it was his inability to follow the law. Therefore, each of these six jurors was properly challenged for cause under the rule established in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed. 2d 776 (1968).

The seventh venireman to be excused for cause was Mrs. William McKee. A review of the transcript which covered her questioning during the jury selection process reveals in part of the following:

Examination by the Court:

\*     \*     \*     \*     \*

Q. If you were satisfied beyond a reasonable doubt of the things the law requires you to be satisfied about then would you recommend, in accordance with the law, recommend a sentence of death, or do you have such strong feelings about the death penalty that even though you were satisfied beyond a reasonable doubt as to those things, you would not vote for the death penalty?

MRS. MCKEE: I don't feel like I would.

Q. You feel that even though the State had satisfied you of the three elements of the presence of an aggravating circumstance, that it was sufficiently substantial to call for the imposition of the death penalty, and that any mitigating circumstances were insufficient to outweigh the aggravating circumstances, you still feel that you could not vote for the death penalty, even though you were convinced of those things?

MRS. MCKEE: I don't think I could.

\*     \*     \*     \*     \*

Examination by defense attorney, Mr. Chapman.

Q. Could you tell us what your personal views are on the death penalty?

MRS. MCKEE: I'm not sure I know exactly how I feel about it definitely. Given a certain set of personal circumstances, I might have had one feeling one way and another feeling the other way.

Juror McKee indicated, in response to a question concerning her personal views on the death penalty, that she wasn't exactly sure how she felt about it "definitely," but that it would depend on the circumstances. While the question had some relevance in determining Mrs. McKee's ability to function within the law as a "death qualified" juror, the answer was not dispositive; that is, an equivocal answer respecting a juror's *personal views* on the death penalty does not answer the question of whether this prospective juror, in this particular case, would in fact recommend death if legally bound to do so. When asked whether she would vote for the death penalty under the appropriate circumstances, Mrs. McKee answered that she didn't feel she could and she didn't feel she would. We find no equivocation in these answers, which are clearly negative in import. We find no significance in the fact that juror McKee stated that she didn't *feel* or *think* she could vote for the death penalty. While the Court might have gone further and required a simple yes or no answer, failure to do so is not fatal, where the court is satisfied, after observing the demeanor of the juror and hearing the responses, that the juror has indicated a negative response.

Although Mrs. McKee's responses to questions asked by the court as to whether she would put her personal views aside and follow the law were phrased in the form of "I don't feel like I would" or "I don't think I could," they reflect her inability to follow the law when considered in the context of her entire examination. *State v. Williams*, 305 N.C. 656, 292 S.E. 2d 243 (1982), *cert. denied*, --- U.S. ---, 103 S.Ct. 474, 74 L.Ed. 2d 622 (1982). We therefore hold that the seven jurors were properly challenged and excused for cause.

[2] Defendant also contends that the exclusion of the seven veniremen for cause deprived him of his right to a trial by jury

drawn from a cross-section of the community. This exact issue was recently decided by this Court contrary to the defendant's position. "The excuse of these jurors for cause did not deprive defendant of his constitutional rights to trial by a jury representing a cross-section of the community or due process of law." *State v. Pinch*, 306 N.C. 1, 9, 292 S.E. 2d 203, 213 (1982), *cert. denied*, --- U.S. ---, 103 S.Ct. 474, 74 L.Ed. 2d 622 (1982). This assignment of error is overruled.

## II.

[3]   The defendant contends that he was prejudiced during the guilt phase of his trial due to the trial court's exclusion of opinion testimony by Mr. O. B. Starnes, a psychologist, who administered a battery of psychological examinations to the defendant on 25 May 1981, one week after the crimes were committed. Defendant's counsel at trial attempted to have Mr. Starnes give an opinion as to the defendant's mental status at the time of the examinations. The State objected to Mr. Starnes' opinion on the basis that the defense had failed to comply with the pretrial discovery concerning this testimony. The court sustained the State's objection on the basis that the defendant's mental state one week after the crimes were committed was not relevant to his mental state at the time the crimes took place. However, the trial judge did suggest that a question concerning defendant's mental capacity on the day of the crimes would be admissible.

The law in this State concerning a defendant's mental state at times before and after a crime is committed is set out in *State v. Atkinson*, 275 N.C. 288, 167 S.E. 2d 241 (1969). Justice Lake, speaking for the Court, stated, that "the mental condition of the accused, both before and after the commission of the act, is competent provided it bears such relation to the defendant's condition of mind at the time of the alleged crime as to be worthy of consideration in respect thereto." 275 N.C. at 314, 167 S.E. 2d at 256. Although the mental condition of the accused in this case, one week after the shootings occurred, is not determinative of his mental state at the time of the crimes, it is due some consideration.

However, it is the defendant's burden to establish that the exclusion of evidence was prejudicial to his case. *State v. Boykin*, 298 N.C. 687, 259 S.E. 2d 883 (1979). The defendant has failed to

show that the exclusion of Mr. Starnes' opinion testimony resulted in prejudice. In the first instance, the defense attorney at trial stated that Mr. Starnes' testimony was being offered to show the professional manner in which the psychological testing was administered. The court allowed testimony as to the professional manner in which the testing was conducted and only excluded the opinion testimony. Secondly, even if the defense had desired to have Mr. Starnes give his opinion concerning defendant's mental condition one week after the shootings, there is nothing in the record on which this Court can base a decision as to whether the exclusion was prejudicial. The defense failed to take exception to Judge Snepp's ruling at trial and failed to have the opinion testimony placed into the record. Under G.S. 15A-1446(a) a party is required to take an exception to a ruling excluding evidence and offer such evidence into the record when the evidence is excluded. The purpose of this rule is to enable a reviewing court to make an informed decision. As the record stands in this case, we are unable to determine whether Mr. Starnes' opinion would have been favorable to the defendant's case. "When evidence is excluded, the record must sufficiently show what purport of the evidence would have been, or the propriety of the exclusion will not be reviewed on appeal." Brandis on North Carolina Evidence; Sec. 26. Accord: *State v. Shaw*, 293 N.C. 616, 239 S.E. 2d 439 (1977). The defendant has failed to show any prejudice resulting from the exclusion of Mr. Starnes' opinion testimony. Therefore, this assignment of error is overruled.

III.

Defendant next assigns as error the prosecutor's argument to the jury. Defendant contends that the prosecutor committed three errors, any one of which entitles him to a new trial. The three contended errors are: (a) improper remarks concerning a defense witness; (b) arguments concerning false propositions of law; and (c) improper arguments of facts not supported by the record.

Prior to discussing the merits of each contended error during the prosecutor's argument to the jury, we must set forth the standard of review to be employed. The defense counsel at trial failed to object to or take exception to any part of the prosecutor's final argument to the jury. If a party fails to object to a jury

argument, the trial court may, in its discretion, correct improper arguments. *State v. Johnson*, 298 N.C. 355, 259 S.E. 2d 752 (1979). When a party fails to object to a closing argument we must decide whether the argument was so improper as to warrant the trial judge's intervention *ex mero motu*. We are therefore reviewing the judge's action and must decide if he abused his discretion. In *State v. Johnson*, 298 N.C. 355, 259 S.E. 2d 752 (1979), Chief Justice Branch stated:

> In capital cases, however, an appellate court may review the prosecution's argument, even though defendant raised no objection at trial, but the *impropriety* of the argument must be *gross* indeed in order for this Court to hold that a trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it.

298 N.C. at 369, 259 S.E. 2d at 761. (Emphasis added.)

[4] (A) Defendant contends the prosecutor made improper disparaging remarks about Dr. Selwyn Rose, a psychiatrist who testified on behalf of the defendant. The following statements made by the prosecutor during closing arguments are excepted to on appeal:

> . . . Dr. Selwyn Rose out of Winston-Salem by way of Los Angeles, and he breezes up here like some guru visiting his flock . . .

*    *    *    *    *

> . . . Hot dog, we've got ourselves a doctor from California. He's got all these degrees. He's got a crystal ball, members of the jury, that allows him to look into a man's mind and see exactly what's there. Do you all believe that? Do you believe that a forensic psychiatrist, who makes a living testifying about people's state of mind in court, and don't you know he's got an incentive to give them something that will help them because if he doesn't, he's not going to get any new customers.

*    *    *    *    *

> . . . He just breezes in here like a guru from California and says, "Ah, I looked into my crystal ball on May 16, 1981 and I

saw in Rondale's mind that he did not have the state of mind to be able to form the specific intent.

\*　　\*　　\*　　\*　　\*

. . . Well, let's not mince words about the fine Dr. Rose. I submit to you he's like a whore.

In North Carolina it is well settled "that counsel is allowed wide latitude in the argument to the jury." *State v. Johnson*, 298 N.C. 355, 368, 259 S.E. 2d 752, 761 (1979); see also: *State v. Covington*, 290 N.C. 313, 226 S.E. 2d 629 (1976). "Even so, counsel may not, by argument or cross-examination, place before the jury incompetent and prejudicial matters by injecting his own knowledge, beliefs, and personal opinions not supported by the evidence." (Citations omitted.) *State v. Britt*, 288 N.C. 699, 711, 220 S.E. 2d 283, 291 (1975). A prosecutor must present the State's case vigorously while at the same time guarding against statements which might prejudice the defendant's right to a fair trial.

In light of the severe punishment imposed in this case, we have carefully scrutinized the record and the transcript. Dr. Rose's testimony reflects both a lack of preparation and an absence of thorough investigation into the defendant's mental and physical condition at the time of the shootings. On cross-examination Dr. Rose stated that he did not even look at the toxicologist's report of the results of defendant's blood analysis prior to determining the defendant's level of intoxication. In addition, Dr. Rose admitted that he did not make any kind of written report in this case because of the time and costs such a report would require. Although the prosecutor used language and made arguments designed to discredit the testimony of Dr. Rose, in light of the testimony given by Dr. Rose, we do not find that the statements were grossly improper requiring the court to act *ex mero motu*. We do emphasize, however, that some of the descriptive words employed by the State should have been avoided and under a separate set of circumstances might have resulted in error.

[5]　(B) Defendant also contends that the prosecutor made prejudicial misstatements of law during his closing argument. Specifically defendant argues that his defense went to his inability to premeditate and deliberate due to intoxication and that the

prosecutor insinuated during his closing argument that the level of intoxication necessary to negate premeditation and deliberation was one such that the defendant must be incapable of knowing what he was doing.

"It is well settled that voluntary drunkenness is not a legal excuse for crime." *State v. Propst,* 274 N.C. 62, 71, 161 S.E. 2d 560, 567 (1968). However, drunkenness may reduce a greater offense to a lesser offense by negating a specific intent.

> [I]n cases where it becomes necessary, in order to convict an offender of murder in the first degree, to establish that the 'killing was deliberate and premeditated,' these terms contain an essential element of the crime of murder, 'a purpose to kill previously formed after weighing the matter' (citation omitted), a mental process embodying a specific definite intent, and if it be shown that an offender, charged with such crime, is so drunk that he is *utterly* unable to form or entertain this essential purpose he should not be convicted of the higher offense. (Emphasis added.)

*State v. Murphy,* 157 N.C. 614, 617, 72 S.E. 1075, 1076 (1911). Accord: *State v. Propst,* 274 N.C. 62, 161 S.E. 2d 560 (1968).

In reviewing the statements made by the prosecutor concerning the level of intoxication necessary to negate the required specific intent, we find no gross impropriety which would require the judge to intervene *ex mero motu.* We therefore find no prejudicial error in the prosecutor's remarks concerning the level of intoxication necessary to a defense to murder in the first degree.

**[6]** (C) Defendant also argues that the prosecutor in creating a "scenario" for each murder, argued matters not supported by evidence in the record. An attorney may argue the law and the facts in evidence and all reasonable inferences drawn from them but he may neither argue principles of law irrelevant to the case nor argue facts not present in the record. *State v. Monk,* 286 N.C. 509, 212 S.E. 2d 125 (1975). We have carefully reviewed the transcript and record in this case and find that there was sufficient evidence from which the prosecutor's scenarios of how each murder was committed could reasonably be inferred.

In reviewing all of the prosecutor's arguments to the jury, we fail to find the type of grossly improper statements which

would require a trial court to act *ex mero motu*. Therefore we overrule each of defendant's assignments of error to the prosecutor's closing arguments.

## IV.

[7]  The defendant next contends that the trial court's instructions to the jury on premeditation and deliberation and specific intent were constitutionally insufficient because the judge failed to instruct the jury to consider the defendant's evidence relating to his mental condition. Defendant argues that the jury should be allowed to consider the impact which intoxication has on a person's ability to premeditate, deliberate and form a specific intent when suffering from a mental condition such as the one attributed to the defendant. In other words, the defendant wants this Court to establish a separate intoxication standard for persons suffering from mental disorders. We refuse to establish such a standard.

This Court has held in numerous cases that it is not error for the trial judge to fail to instruct the jury that a mental disorder, which does not afford a defendant a defense of insanity, may be used to negate the elements of specific intent and premeditation and deliberation. *State v. Anderson*, 303 N.C. 185, 278 S.E. 2d 238 (1981); *State v. Franks*, 300 N.C. 1, 265 S.E. 2d 177 (1980); *State v. Harris*, 290 N.C. 718, 228 S.E. 2d 424 (1976). Although intoxication may be a defense to be used to negate specific intent or premeditation and deliberation, this Court has consistently refused to permit mental incapacity, insufficient to establish legal insanity, to constitute a defense to first degree murder. *State v. Anderson*, 303 N.C. 185, 278 S.E. 2d 238 (1981). We see no reason to abandon our present posture of treating separately the insanity defense and the intoxication defense.

In the case *sub judice* the jury was properly charged as to the State's burden of proving beyond a reasonable doubt all the elements of first degree murder and assault with a deadly weapon with the intent to commit murder. Likewise the jury was properly instructed as to the effect the defendant's intoxication might have on negating those elements. The law of this State does not recognize and will not create a separate intoxication defense for a legally sane defendant who has social and mental problems. This assignment of error is therefore overruled.

## PENALTY PHASE

### V.

[8]  Defendant contends he was deprived of his right to be free from cruel and unusual punishment when the prosecutor argued, without corrective instructions from the trial judge, that the jury ought to consider defendant's future dangerousness, diminished capacity and mental illness as aggravating factors rather than mitigating factors. In addition, defendant argues it was error for the State to suggest that the death penalty would be a deterrent in this case.

After reviewing the State's argument to the jury during the penalty phase and the trial court's subsequent instructions on the law, we find no error. Defendant contends that the State, through its argument, placed before the jury several non-statutory aggravating circumstances. We cannot agree. At the beginning of its argument the State made clear that, "the aggravating circumstance we're relying upon in this case I would like to read you now. . . . 'The murder for which the defendant was convicted was part of a course of conduct in which the defendant engaged and which included the commission of other crimes of violence against a person or persons.' "

We recognize that during its argument concerning mitigating circumstances the State made several remarks concerning the weight several mitigating factors should be afforded and suggested that one mitigating factor was really aggravating. The remarks in this case were clearly directed at the weight the jury should give the various mitigating circumstances and were not an attempt to place before the jury any non-statutory aggravating factors.

Any possible confusion created in the minds of the jurors by the State's argument was eliminated by a complete and proper instruction by the trial judge. The judge instructed,

[U]nder the evidence in these cases there is *one* possible aggravating circumstance. . . .

\*      \*      \*      \*      \*

If you do not unanimously find, from the evidence and beyond a reasonable doubt, that this aggravating circum-

stance existed in one or both of the cases, you skip issues two in that case, three in that case, and four. In other words, if you find 'no' in either case, you would skip the other issues, and must then recommend in that case that the defendant be sentenced to life imprisonment.

This instruction makes it clear beyond all doubt that there was only one aggravating factor to be considered by the jury. Although we find no error in the State's argument we do suggest that any argument concerning the proper weight to be given mitigating circumstances be done without referring to those factors as aggravating.

[9] Defendant also contends error resulted from the State's request that the jury impose the death sentence as a deterrent. This Court has held that a defendant may not introduce evidence of the death penalty's lack of deterrent effect. *State v. Cherry*, 298 N.C. 86, 257 S.E. 2d 551 (1979); *State v. Taylor*, 304 N.C. 249, 283 S.E. 2d 761 (1981); *State v. Williams*, 305 N.C. 656, 292 S.E. 2d 243 (1982), *cert. denied*, --- U.S. ---, 103 S.Ct. 474, 74 L.Ed. 2d 622 (1982). In support of this contention defendant relies on *State v. Cherry*, 298 N.C. 86, 257 S.E. 2d 551 (1979), in which this Court held that *evidence* concerning the death penalty's deterrent effect is irrelevant to the jury sentencing determination. Defendant asserts that it is unfair to allow the State to *argue* that the death penalty should be imposed as a deterrent while prohibiting the defendant from offering *evidence* of the death penalty's lack of deterrent effect. In his argument to the jury the prosecutor stated, "I'm asking you to impose the death penalty as a deterrent, to set a standard of conduct. . . ." This statement is an interjection of the prosecutor's personal viewpoint. Although such a statement is improper it was not objected to and we do not find that it was grossly improper so as to warrant action by the trial court *ex mero motu. State v. Johnson*, 298 N.C. 355, 259 S.E. 2d 752 (1979). This argument does not constitute prejudicial error.

VI.

[10] Defendant next argues that the trial judge erred in his instruction to the jury concerning the sentence recommendation procedure. This assignment of error encompasses both the order and form of the issues presented to the jury.

Defendant first assigns as error the order in which the four issues were presented to the jury. Specifically defendant objects to issue number two which was to be decided prior to the consideration of any mitigating circumstances. Issue two provides:

> Do you unanimously find, beyond a reasonable doubt, that the aggravating circumstance found by you is sufficiently substantial to call for the imposition of the death penalty?

The trial judge instructed the jury that if they answered issue number two "no" they would have to recommend a sentence of life imprisonment. Defendant argues that such instructions allowed the jury to consider the ultimate determination of life imprisonment or death before any mitigating circumstances were considered and that such a practice violates the rule of *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed. 2d 973 (1978) and *Eddings v. Oklahoma*, --- U.S. ---, 102 S.Ct. 869, 71 L.Ed. 2d 1 (1982). We do not agree with the defendant's contention.

The ultimate decision to be made by the jury in this case was whether the defendant should receive a punishment of life imprisonment or death. Even though the jury was able to consider issue number two prior to the consideration of any mitigating circumstances, in the event the jury answers issue number two "no," it could only recommend a sentence of life imprisonment. The instructions unquestionably restricted the determination of whether the defendant would receive the death penalty until after all mitigating factors supported by the evidence had been considered. The procedure employed by the judge in this case simply allowed the jury the opportunity to impose a life sentence without first considering the mitigating circumstances. This procedure neither allowed the jury to contemplate imposing the death penalty against the defendant prior to their consideration of all the mitigating circumstances nor did it diminish the impact the mitigating circumstances had on the jury.

[11] Defendant also assails the form of the issues presented to the jury during the sentencing procedure. Defendant argues that the jury must be given a final question which requires it to determine whether the aggravating factors substantially outweigh the mitigating factors sufficient to justify the death penalty. In the case *sub judice* the fourth and final issue presented for the jury's consideration read as follows:

> Do you unanimously find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances?

The precise issue raised by this defendant was recently addressed by us in *State v. McDougall,* --- N.C. ---, --- S.E. 2d --- (slip opinion filed 5 April 1983) in which we recognized that the form and order of the issues to be submitted to the jury should be as follows:

(1) Do you find from the evidence beyond a reasonable doubt the existence of one or more of the following aggravating circumstances?

(2) Do you find from the evidence the existence of one or more of the following mitigating circumstances?

(3) Do you find beyond a reasonable doubt that the mitigating circumstance or circumstances you have found is, or are, insufficient to outweigh the aggravating circumstance or circumstances you have found?

(4) Do you find beyond a reasonable doubt that the aggravating circumstance or circumstances found by you is, or are, sufficiently substantial to call for the imposition of the death penalty when considered with the mitigating circumstance or circumstances found by you?

*State v. McDougall,* --- N.C. ---, --- S.E. 2d --- (slip opinion p. 42 filed 5 April 1983).

Although the jury instructions given during the sentencing procedure were not a model charge, they were free from prejudicial error. Since this defendant will receive a new sentencing hearing we instruct that the format established by Justice Martin in *State v. McDougall, supra,* be employed at that new sentencing hearing. This assignment of error is overruled.

## VII.

[12] Defendant next assigns as error the trial court's instruction to the jury concerning the unanimity requirements for finding mitigating circumstances. The able trial judge instructed the jury, upon a request for additional instructions, that the defendant has the burden of persuading the jury as to the existence of any

mitigating circumstance and if all twelve jurors are unable to agree that a specific mitigating circumstance exists they must find that it does not exist. Defendant argues that if the trial judge was in fact correct in his instructions concerning the unanimity requirement for finding the existence of mitigating circumstances, then the same unanimity requirement must be employed in finding a mitigating circumstance does not exist. In short, the defendant contends it was error for the trial judge to instruct the jury that something less than a unanimous rejection of the existence of a mitigating circumstance is proper in finding that circumstance not to exist. We disagree with defendant's proposition.

First, we note that both the Constitution of North Carolina, Article I, Secs. 24 and 25, and G.S. 15A-2000, the statute covering the sentencing process in capital cases, requires all verdicts of the jury to be unanimous. This Court has also held that a verdict of death in a capital case must be by unanimous vote of the twelve jurors. *State v. Cherry*, 298 N.C. 86, 257 S.E. 2d 551 (1979). We now hold that the jury must unanimously find that an aggravating circumstance exists before that circumstance may be considered by the jury in determining its sentence recommendation.

Although it is a settled principle that all verdicts, including those within a sentencing procedure, must be unanimous, there has never been a determination by this Court or our legislature on the issue of whether a jury must be unanimous in finding that a mitigating circumstance exists. Certainly consistency and fairness dictate that a jury unanimously find that a mitigating circumstance exists before it may be considered for the purpose of sentencing. This is what the trial judge instructed the jury and in that part of his instruction we find no error.

Defendant contends, however, that even if it is proper that a mitigating circumstance exists only when there is unanimous agreement by the jury, the trial judge erred when he instructed the jurors that a mitigating circumstance must be deemed not to exist in the absence of a unanimous agreement on its existence. Defendant urges this Court to impose the following requirement: that in order for a jury to find that a mitigating factor does not exist it must first unanimously agree it does not exist. If no

unanimous agreement is reached, defendant contends, the result is a hung jury and the automatic imposition of life imprisonment. Although novel, the suggested approach is unworkable and contrary to the general principles of unanimity.

The consideration of mitigating circumstances must be the same as the consideration of aggravating circumstances. The unanimity requirement is only placed upon the finding of whether an aggravating or mitigating circumstance exists. With the exceptions of who has the burden of proof and the different quantum of proof required to establish the existence of a circumstance, we see no reason to distinguish the method a jury must use in finding the existence or nonexistence of aggravating and mitigating circumstances during the sentencing procedure. It must be kept in mind that when the sentencing procedure begins there are no aggravating or mitigating circumstances deemed to be in existence. Each circumstance must be established by the party who bears the burden of proof and if he fails to meet his burden of proof on any circumstance, that circumstance may not be considered in that case.

In determining whether a mitigating circumstance exists, the jury is free to consider all the evidence relevant to that circumstance. This procedure is in accord with the requirements of *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed. 2d 973 (1978) and *Eddings v. Oklahoma,* --- U.S. ---, 102 S.Ct. 869, 71 L.Ed. 2d 1 (1982). We therefore find no error in the trial judge's instructions to the jury concerning the unanimity requirement on mitigating circumstances.

## VIII.

[13]   The defendant next assigns as error the trial judge's failure to peremptorily instruct the jury on the defendant's mitigating circumstance of no significant prior criminal history which is a statutory mitigating circumstance set out in G.S. 15A-2000(f)(1). It is not for the jury's determination. The trial judge determined that the evidence showed no significant history of prior criminal conduct and he instructed the jury to that effect. However, the trial judge instructed further that, "if you reach this issue, in either or both cases, you will answer it 'yes,' if you find that fact to have mitigating value, if you fail to so find, you will answer it 'no.' " In this further instruction the trial judge erred because our

legislature has determined that in all capital cases the absence of a significant history of prior criminal activity is a mitigating circumstance. G.S. 15A-2000(f)(1). Therefore, the jury should have been instructed that they must answer "yes" to the finding of no significant criminal history. As a result it was improper for the trial judge to instruct the jury that they could find that factor not to be mitigating and therefore find it does not exist.

The State argues that since the jury failed to find the absence of a significant criminal history in mitigation, it must follow that the erroneous instruction was harmless beyond a reasonable doubt because it would have been afforded little or no weight in the final sentence determination. There are three problems with the State's position: (1) Our legislature has determined that if this circumstance exists, it may be considered mitigating and weighed in the final determination; (2) the jury's final sentence determination is very delicate and it cannot be said what effect the absence of this mitigating factor had on that final determination; and (3) allowing the jury the discretionary power to completely disregard a statutory mitigating factor proven by the evidence would return the final sentencing procedure to the realm of unguided decision making which is prohibited under *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed. 2d 346 (1972).

When any mitigating circumstance is unanimously found to exist, the jury must consider that mitigating circumstance in its final sentence determination. In *State v. Johnson*, 298 N.C. 47, 257 S.E. 2d 597 (1979) we held that when a mitigating factor is uncontroverted the trial judge must give a peremptory instruction to the jury on that circumstance. The effect of this type of instruction is to remove the question of whether the mitigating circumstance exists from the jury's determination and to conclusively establish the existence of that factor. It also requires the jury to consider the peremptorily instructed circumstance in its final determination of a sentence recommendation. It does not, however, affect the weight that ultimately may be assigned to that circumstance by the jury. The weight any circumstance may be given is a decision entirely for the jury. *State v. McDougall,* --- N.C. ---, --- S.E. 2d --- (slip opinion filed 5 April 1983). As a result of the trial court's failure to properly peremptorily instruct the jury as to the absence of a significant history of prior criminal activity, we remand this case to Superior Court, Mecklenburg

County, for a new sentencing hearing on both first degree murder convictions.

## IX.

[14] Defendant next contends that the trial court erred by denying defendant's motion for a directed verdict of life imprisonment. Defendant grounds this assignment of error on G.S. 15A-2000(b) which provides that a life sentence must be imposed if the jury is unable to reach a unanimous verdict within a reasonable time period. We recently held in *State v. Johnson*, 298 N.C. 355, 259 S.E. 2d 752 (1979) that, "(W)hat constitutes a 'reasonable time' for jury deliberation in the sentencing stage should be left to the trial judge's discretion." 298 N.C. at 370, 259 S.E. 2d at 762. The approach set out in *Johnson* is sound since the trial judge is in the best position to determine how much time is reasonable under the facts of a specific case. Some cases may involve numerous aggravating factors and no mitigating factors, while other cases may have many of both factors.

In *State v. Johnson*, 298 N.C. 355, 259 S.E. 2d 752 (1979), we held that three hours and thirty-nine minutes was not an unreasonable amount of time to consider whether to impose the death penalty. In this case the jury deliberated for seven and one-half hours. The jury's deliberations were interrupted twice for meals and twice for further instructions from the judge. The total time the jury actually spent deliberating was approximately seven hours and the longest uninterrupted span of time for deliberations was one hour and fifty-two minutes. In this case the jury was confronted with fourteen mitigating factors which had to be considered in two separate cases. In addition the jury was required to make a final sentence determination and recommendation for two separate murder convictions.

We cannot say from the facts in this case that the trial judge abused his discretion by refusing to impose a life sentence in each capital case on the basis that the jury could not reach a unanimous sentence recommendation within a reasonable time period. This assignment of error is overruled.

## X.

[15] Defendant next challenges, as unconstitutional, North Carolina's capital punishment law on the grounds that it permits

subjective discretion and discrimination by the jury in imposing a death sentence in violation of *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed. 2d 346 (1972). The basic premise of defendant's claim is that it is improper to require the trial judge to instruct the jury on second degree murder any time the State relies on premeditation and deliberation to support a conviction of first degree murder, regardless of the fact that there is no evidence to support the lesser offense of second degree murder. We recently held in *State v. Strickland*, 307 N.C. 274, 298 S.E. 2d 645 (1983) that the rule requiring a judge to instruct on second degree in all first degree murder cases, where the State relies on premeditation and deliberation, was not supported by precedent and was therefore overruled.

Although the practice overruled in *Strickland* was in use at the time this defendant was tried, convicted and sentenced, it has no application to this case. In the case *sub judice* the defendant's entire defense was based upon his inability to premeditate and deliberate or specifically intend his actions. During the trial the defendant offered evidence of his intoxication and his mental disorders. He also offered the testimony of Dr. Rose, a psychiatrist, who stated that in his opinion the defendant could not have premeditated and deliberated his actions on the night of the murders. Under these circumstances, where the defendant's evidence supported a lesser offense than first degree murder, the trial judge was required to instruct on the lesser offense of second degree murder.

The instructions given to the jury concerning the offense of second degree murder were proper. The defendant in this case cannot assail the practice overruled by this Court in *State v. Strickland*, 307 N.C. 274, 298 S.E. 2d 645 (1983). As a result, this assignment of error is overruled.

## XI.

[16] Defendant next assigns as error the procedure set out in G.S. Sec. 15A-2000(a)(2) which requires the same jury to hear both the guilt phase and the penalty phase of the trial. Defendant contends that "death qualifying" the jury prior to the guilt determination phase results in a guilt prone jury which denies the defendant the right to a fair trial and fair sentencing and subjects him to cruel and unusual punishment in violation of the Sixth,

Eighth, and Fourteenth Amendments to the United States Constitution. We have decided this issue against the defendant's position in *State v. Avery*, 299 N.C. 126, 261 S.E. 2d 803 (1980), and we recently affirmed that holding in *State v. Pinch*, 306 N.C. 1, 292 S.E. 2d 203 (1982), *cert. denied* , --- U.S. ---, 103 S.Ct. 474, 74 L.Ed. 2d 622 (1982). This assignment of error is overruled.

## XII.

Defendant next requests that the Court reconsider its holding in *State v. Pinch*, 306 N.C. 1, 292 S.E. 2d 203 (1982), *cert. denied*, --- U.S. ---, 103 S.Ct. 474, 74 L.Ed. 2d 622 (1982), that the law implies that a killing was done unlawfully and with malice when the defendant intentionally inflicts a wound upon a victim with a deadly weapon resulting in death. We refuse to depart from our holding in *Pinch* and overrule this assignment of error.

## XIII.

[17] Defendant also contends that it is unconstitutional for the State to try, convict and sentence a defendant for a series of crimes and then submit those same crimes as aggravating factors during the sentencing hearing in a capital case. We rejected the defendant's argument in *State v. Pinch*, 306 N.C. 1, 292 S.E. 2d 203 (1982), *cert. denied*, --- U.S. ---, 103 S.Ct. 474, 74 L.Ed. 2d 622 (1982) and in *State v. Williams*, 305 N.C. 656, 292 S.E. 2d 243 (1982), *cert. denied*, --- U.S. ---, 103 S.Ct. 474, 74 L.Ed. 2d 622 (1982). This assignment of error is overruled.

## XIV.

[18] Defendant argues that G.S. 15A-2000(e)(11) is unconstitutionally vague as interpreted by this Court. G.S. 15A-2000(e)(11), a statutory aggravating circumstance provides:

The murder for which the defendant stands convicted was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons.

We have decided this issue against the defendant's position in *State v. Williams*, 305 N.C. 656, 292 S.E. 2d 243 (1982), *cert denied*, --- U.S. ---, 103 S.Ct. 474, 74 L.Ed. 2d 622 (1982). We overrule this assignment of error.

## XV.

Defendant next argues that it was improper for the trial judge to instruct the jury that if it found the aggravating circumstances outweighed the mitigating circumstances, it must return a recommendation of the death penalty. This assignment of error has been fully dealt with in part VI of this opinion. For the reasons stated in part VI of this opinion, we overrule this assignment of error.

## XVI.

[19] Defendant contends he was deprived of his rights guaranteed under the Eighth and the Fourteenth Amendments to the United States Constitution by the trial court's failure to instruct the jury that the State had the burden of disproving the existence of each mitigating circumstance beyond a reasonable doubt. The trial judge properly placed upon the defendant the burden of proving, by the preponderance of the evidence, the existence of each mitigating factor. We upheld this type of instruction in *State v. Barfield,* 298 N.C. 306, 259 S.E. 2d 510 (1979), *cert. denied,* 448 U.S. 907, 100 S.Ct. 3050, 65 L.Ed. 2d 1137 (1980). This assignment of error is overruled.

## XVII.

Defendant contends that the North Carolina death penalty statute, G.S. 15A-2000, is unconstitutional and as a result the death penalties imposed in this case are unconstitutional. We have upheld the constitutionality of this statute in numerous cases including *State v. Williams,* 304 N.C. 394, 284 S.E. 2d 437 (1981), *cert. denied,* --- U.S. ---, 102 S.Ct. 1985, 72 L.Ed. 2d 450 (1982), and *State v. Barfield,* 298 N.C. 306, 259 S.E. 2d 510 (1979), 448 U.S. 907, 100 S.Ct. 3050, 65 L.Ed. 2d 1137 (1980). This assignment of error is overruled.

## XVIII.

In his final argument the defendant contends that the death penalty imposed upon him for each first degree murder conviction is an excessive and disproportionate punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution. We do not address this final assignment of error in light of our granting the defendant a new sentencing hearing. *State v. Goodman,* 298 N.C. 1, 257 S.E. 2d 569 (1979).

Having found no error in the guilt determination phase of defendant's trial, we therefore uphold his convictions of two counts of first degree murder and two counts of assault with a dangerous weapon with the intent to commit murder. However, we remand this case to the Superior Court, Mecklenburg County for a new sentencing hearing on both first degree murder convictions.

No error: guilt determination.

New sentencing hearing on both first degree murder convictions.

Justice EXUM concurring in part and dissenting in part.

On the guilt phase of this case I believe defendant is entitled to a new trial in the homicide cases for failure of the trial court to instruct the jury on the combined effect of his mental illness and his alcohol and drug induced intoxication on his capacity to premeditate and deliberate. I concur in the result reached by the majority on the sentencing phase of the case, but I disagree with the majority's conclusions on some of the questions presented.

## GUILT PHASE

On the guilt phase it is important to note that in the homicide cases defendant's entire defense rested on his alleged inability to premeditate and deliberate. Even more important, the evidence upon which defendant relied tended to show that this inability was due not to his mental impairment, standing alone, or to his intoxication, standing alone; rather it was due to the combined effects of both his intoxication and his mental impairment. Much of defendant's evidence was designed to show the large quantity of alcohol and drugs he had consumed during the several days preceding the killings. It was left, however, to defendant's principal witness, Dr. Selwyn Rose, qualified as an expert psychiatrist, to tell the jury about defendant's mental illness and the combined effect of this illness and defendant's intoxication.

Dr. Rose testified that in his opinion defendant at the time of the homicide "was intoxicated, and that he suffered from serious underlying mental illness, and that both of these conditions were

present at the time of the offense." In Dr. Rose's opinion defendant suffered from "a borderline psychosis, borderline schizophrenia of the schizoid type. . . ." Upon his examination of defendant Dr. Rose also found "some evidence of a long-term depression . . . . [L]ife was a difficult problem for [defendant] and he stayed depressed much of the time and dealt with that depression by his own treatment, which was taking drugs." Finally, Dr. Rose made it clear that in his opinion defendant at the time of the homicides was unable to premeditate and deliberate "because of the intoxication from drugs and because of his underlying personality problems, severe mental illnesses. . . . He wasn't able to reach that level of thinking which we call premeditation and deliberation, which involved a fairly high level of thinking process, and he was not able to do that kind of thinking at that time."

Dr. Rose made it clear that defendant's mental condition standing alone would not have had this effect. When asked whether defendant's mental condition "by itself, absent any drug involvement, result[ed] in the shootings," he replied, "I don't think it did." He further testified that the intoxication, standing alone, would not have affected his ability to premeditate and deliberate. When asked whether his opinion about defendant's condition at the time of the homicides was based on his "looking solely at the drugs that he has been shown to have taken," the doctor replied:

No. The drugs were considered in an interaction with this explosive personality. . . . The issue was how did the drugs affect that person at that time, and the way they affected it was they blew the cover, the control system, and the rage, the anger, came pouring out. So it was the combination of the two that was essential.

This testimony by Dr. Rose was the sole foundation of defendant's entire defense in the homicide cases. Yet the trial court failed in its final jury instruction to mention defendant's mental condition as being relevant on the issue of premeditation and deliberation. On this issue the trial court instructed the jury only that it could consider "the evidence with respect to defendant's intoxication or drugged condition." In light of defendant's evidence that his inability to premeditate and deliberate was caused not by his liquor and drug induced intoxication, standing

alone, nor by his mental illness, standing alone, but by the combined effects of both, I think the trial court's instructions on this aspect of the case so severely undercut the only defense proffered as practically to nullify it altogether. Defendant was thereby denied a fair trial on this, the only real issue in the homicide cases.

Had the defense on the premeditation and deliberation issue rested entirely on intoxication, the instructions would have been sufficient. Had the defense rested entirely on defendant's mental impairment, defendant would have been entitled to no instruction at all since a majority of this Court held in *State v. Cooper*, 286 N.C. 549, 213 S.E. 2d 305 (1975), over the cogent dissent of then Chief Justice Sharp, a case in which neither the author of the majority opinion nor I participated, that mental illness alone, short of legal insanity, cannot negate the elements of premeditation and deliberation in a homicide case. This Court has continued to follow *Cooper* in a series of cases beginning with *State v. Wetmore*, 287 N.C. 344, 215 S.E. 2d 51 (1975), *death penalty vacated*, 428 U.S. 905 (1976), and ending with *State v. Anderson*, 303 N.C. 185, 278 S.E. 2d 238 (1981). Whether *Cooper* and its progeny were correctly decided is a question which continues to plague me. Here, however, we do not have to overrule *Cooper* and its progeny in order to decide the issue presented correctly. For here the question is not whether mental illness alone can negate the elements of premeditation and deliberation. The question is whether such illness when combined with the intoxicating effects of alcohol and drugs can negate such elements. Clearly, it seems to me, the answer to this issue should be yes.

Indeed, *State v. Propst*, 274 N.C. 62, 161 S.E. 2d 560 (1968), seems to so hold. In *Propst*, defendant was convicted at trial of first degree murder and sentenced to life imprisonment. He offered evidence that at the time of the killing he had drunk a considerable amount of whiskey and that he also suffered from schizophrenia. Although the trial court instructed the jury on defendant's mental illness insofar as it might have made out a complete insanity defense, the trial court said nothing about defendant's intoxication as it might have rendered defendant unable to premeditate and deliberate. This Court concluded that the failure was error warranting a new trial. The Court said:

> In our view, the evidence as to defendant's intoxication is insufficient to support a finding that he was so drunk that

he was *utterly unable* to form an actual, specific intent to kill, after premeditation and deliberation, and was insufficient to support a finding that defendant was *utterly unable* to form a specific intent to shoot Taylor. Even so, when considered in connection with [some evidence of self-defense] and in connection with the testimony as to defendant's mental status and nervous condition, we think the testimony relating to his intoxication was competent *for consideration* as bearing upon whether the State had satisfied the jury from the evidence beyond a reasonable doubt that defendant had unlawfully killed Taylor in the execution of *an actual, specific intent to kill, formed after premeditation and deliberation,* and for consideration as bearing upon whether the State has satisfied the jury from the evidence beyond a reasonable doubt that defendant *intentionally* shot Taylor and thereby proximately caused his death. In our view, the court, in charging the jury, should have referred to the evidence relating to defendant's intoxication and should have given instructions as to how it should be considered.

274 N.C. at 72-73, 161 S.E. 2d at 568 (emphasis original).

For failure, therefore, of the trial court to instruct the jury as to how defendant's intoxication when considered in connection with his mental illness might have affected his ability to premeditate and deliberate, I think defendant is entitled to a new trial in the homicide cases. Since this trial began before 1 October 1981, defendant did not have to object at trial to this failure in order to raise it on appeal. *See* N.C. App. R. 10.

I also think the district attorney's unnecessarily vituperative remarks about Dr. Rose during closing argument should be more vigorously censured by this Court than the majority has done. This kind of language used with reference to a qualified psychiatric expert under the circumstances presented has no place in a court of law. I see nothing in Dr. Rose's testimony which would remotely suggest, let alone justify, this kind of attack on him personally. Indeed, his conclusions were largely corroborated during the sentencing phase by the testimony of Dr. James Groce, a psychiatrist who examined defendant at Dorothea Dix Hospital. Dr. Groce expressed the opinion that defendant had "some impairment from a mental illness" and had "been chronical-

ly depressed for some time." Dr. Groce felt that defendant was "suffering some impairment, both from the effects of his depression, his emotional state, and the intoxication that he was experiencing with more than one intoxicant." In Dr. Groce's opinion this impairment "would have impaired his reasoning, his judgment, and his control of his behavior."

SENTENCING PHASE

With regard to the sentencing phase I concur in the result reached by the majority. I believe, however, contrary to the conclusion of the majority, that error warranting a new sentencing hearing was committed when the trial court, in effect, instructed the jury that it must unanimously agree that a particular mitigating circumstance existed before it could consider that circumstance. Indeed, the state concedes in its brief that such an instruction may be constitutionally suspect under *Lockett v. Ohio*, 438 U.S. 586 (1978). The state's brief says:

> *Lockett v. Ohio*, 438 U.S. 586 (1978), holds that a statute that prevents the sentencer in all capital cases from giving independent weight to aspects in mitigation creates a risk that a death penalty will be imposed in spite of factors which call for a less severe penalty and thus is unconstitutional. It would seem manifestly improper, then, not to permit members of a jury to consider a factor in mitigation simply because all members of the jury were not satisfied with the defendant's showing concerning a particular mitigating circumstance. It would also make any sentencing procedure unmanageable if each time a jury deadlocked on an issue a new sentencing hearing was required.

> It is the State's position that only those mitigating circumstances found unanimously to exist should be listed on the verdict sheet recommended in *State v. Rook*, 304 N.C. 201, 283 S.E. 2d 732 (1981), *cert. denied*, --- U.S. --- (1982). However, no juror should be precluded from considering anything in mitigation in the ultimate balancing process even if that mitigating factor was not agreed upon unanimously. To do otherwise, the State believes, could run afoul of *Lockett v. Ohio, supra.*

While the state's position on this question might pass constitutional muster, I think the better practice would be to in-

struct: (1) unanimity is not required in order to answer the question of the existence of a mitigating circumstance favorably to defendant; (2) such an issue should be answered unfavorably to defendant only if all jurors agreed to so answer it; (3) such an issue should be answered favorably to defendant if any juror would so answer it with an indication on the verdict form as to how many jurors so voted; and (4) in the final balancing process each juror would be free to consider only those mitigating circumstances which he or she were persuaded existed in the case.

The vice in the instructions here under consideration, which the majority apparently approves, is that the jurors were led to believe that no mitigating circumstance could be considered by any juror unless all jurors agreed that it existed. The instruction occurred when the jury, after deliberating, returned to the courtroom for a question. The question was: "Does the decision of the jury have to be unanimous on an individual circumstance in Issue Three [the issue in which all of the mitigating circumstances were individually listed and answered]"? In response to this question, the court said:

> I instruct you that the defendant has the burden of persuading all twelve jurors, unanimously, that a given mitigating circumstance exists. The jury must unanimously agree in order to find the existence of a given mitigating circumstance. . . . If the defendant satisfies you of the existence of a mitigating circumstance — satisfies all twelve of you — then it is your duty to answer the issue as to that mitigating circumstance 'Yes.' If the defendant fails to satisfy you of the existence — to satisfy the twelve jurors of the existence — of that mitigating circumstance, then it is your duty to answer it 'No.' . . . You must unanimously agree to find the existence of a mitigating circumstance.

There were no other substantive instructions on this question. Thus I am satisfied that the jury thought that unless it unanimously agreed on the existence of a mitigating circumstance, no juror could then consider that circumstance in the ultimate balancing process.

The state concedes that the instructions, if so interpreted by the jury, might run afoul of *Lockett*. I think they clearly do. The state argues, however, that since the jurors found "all factors in

mitigation except for a series of factors which were simply the negative of aggravating circumstances not present in the case," the instruction could not have prejudiced defendant. In each homicide case, however, at least some jurors failed to find that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct with the requirements of the law was impaired. Likewise, at least some jurors failed to find that defendant's age at the time of the commission of the offense was mitigating. Consequently, I don't think the state's argument that the error, if any, was not prejudicial has merit.

I also think error which should result in a new sentencing hearing was committed in the form and manner of submission of the issues, for the reasons stated in my dissenting opinion in *State v. McDougall*, No. 86A81, filed 5 April 1983.

I believe, too, that in the jury selection process *Witherspoon* error was committed which would entitle defendant to a new sentencing hearing.